UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
CLAYTON OSBON,  :  __ Civ. ____
  :
               Plaintiff,  :
  :  **COMPLAINT WITH**
   -against-  :  **JURY DEMAND**
  :
JETBLUE AIRWAYS CORPORATION,  :
  :
               Defendant.  :
-------------------------------------------------------------- X

15 CV 2306

JUDGE SCHOFIELD

RECEIVED MAR 27 2015 U.S.D.C. S.D.N.Y.

## COMPLAINT

Plaintiff Clayton Osbon, by his attorneys, Liddle & Robinson, L.L.P., alleges as follows:

### THE NATURE OF THE ACTION

1.    This is a civil action for damages and remedies based upon breach of contract and negligence.

### JURISDICTION

2.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.

3.    Plaintiff is a resident of Georgia.

4.    Defendant is Delaware corporation with is principal place of business and headquarters in New York.

5.    The amount in controversy exceeds $75,000.

## THE PARTIES

6. Clayton Osbon ("Plaintiff" "Captain Osbon" or "Osbon") is a 52 year old male resident of Georgia.

7. JetBlue Airways Corporation ("JetBlue") is a Delaware corporation with its principal place of business in Long Island City.

## VENUE

8. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Captain Osbon's claims occurred within the Southern District of New York and Defendant is a resident of this district.

## FACTS

9. Captain Osbon is a highly experienced airline captain.

10. Captain Osbon graduated from Nathaniel Hawthorne College in 1987 with a degree in aeronautical physics.

11. Captain Osbon first received his pilot's license in 1985.

12. Captain Osbon first captained a commercial plane in 1987.

13. Prior to March 27, 2012, Captain Osbon maintained a completely clean pilot's license and associated medical certificate.

14. Prior to March 27, 2012, Captain Osbon had not received any violations, fines or other impairments to his pilot's license.

15. Prior to March 27, 2012, the FAA had not taken any negative regulatory actions Captain Osbon's pilot's license.

16. Captain Osbon was actively employed by JetBlue as a Captain and airline pilot from 2000 until March 27, 2012 when he was placed on medical leave.

2

17. Prior to March 27, 2012, JetBlue had never taken any negative employment actions against Captain Osbon.

18. During his employment with JetBlue, Captain Osbon primarily flew Airbus commercial airliners.

19. Captain Osbon was an exemplary employee throughout his active employment with JetBlue.

20. Accordingly, JetBlue made Captain Osbon a Flight Standards Captain who worked with JetBlue to develop and maintain appropriate safety procedures.

21. Unknown to Captain Osbon, a childhood traumatic head injury damaged his brain. Captain Osbon fully recovered from the initial injury, except for the unknown brain damage, and was completely asymptomatic until in or around March 27, 2012.

22. JetBlue failed to identify Captain Osbon's condition prior to March 27, 2012.

23. In or around March 27, 2012, Captain Osbon began to suffer, for the first time in his life, a complex partial brain seizure.

24. Captain Osbon's seizure severely impaired his ability to perform basic activities, caused him to hallucinate, and caused extreme feelings of paranoia and religious fervor.

25. The seizure's symptoms slowly increased over time, causing Captain Osbon to experience increasing paranoia and religious fervor and correspondingly decreasing control over his actions.

26. As of March 27, 2012, Captain Osbon was unaware of his propensity for brain seizures or his brain damage. On March 27, 2012, Captain Osbon was also unaware that he was undergoing a brain seizure.

27. Throughout the entirety of March 27, 2012, Captain Osbon was unable to control his actions, and therefore not responsible for his actions, as a result of a brain seizure.

28. Captain Osbon was scheduled to pilot JetBlue flight 191 ("Flight 191") on March 27, 2012. The flight was scheduled to depart from John F. Kennedy ("JFK") airport in Jamaica, New York and to land at McCarran airport in Las Vegas, Nevada.

29. Prior to Flight 191, in accordance with JetBlue's procedures, the flight crew was scheduled to attend a preflight meeting at JFK.

30. Captain Osbon missed the preflight meeting due to his seizure.

31. JetBlue unsuccessfully called Captain Osbon more than five times, and otherwise attempted to find Captain Osbon, after he failed to report for the preflight meeting.

32. March 27, 2012 was the first time in Captain Osbon's 12 years of employment with JetBlue that he missed a preflight meeting or failed to answer his cellphone in advance of a flight.

33. Captain Osbon previously flew with many members of Flight 191's crew, including the First Officer, Jason Dowd. The crewmembers knew Captain Osbon was a Flight Standards Captain and that he was routinely on time for preflight meetings.

34. In the airline industry, preflight meetings are meant to ensure, among other things, that the flight crew is afforded the opportunity to assess each other's behavior and crew member's readiness and fitness to fly.

35. As of March 27, 2012, JetBlue, however, failed to provide proper mechanisms and guidance for the replacement of unfit crew members.

36. As of March 27, 2012, JetBlue did not instruct its crew members to request a replacement in the event a crew member failed to attend a preflight meeting.

37. As of March 27, 2012, JetBlue failed to create and implement proper procedures to ensure that a crew member, and particularly a pilot, who is either intoxicated, under the influence of narcotics, or otherwise physically or mentally unfit to fly, is not permitted to fly.

38. Captain Osbon eventually arrived for Flight 191 disheveled and disoriented.

39. Captain Osbon's uniform, appearance, and demeanor clearly demonstrated that something was wrong and that he was not fit to fly.

40. Captain Osbon's behavior was highly unusual. Based upon the flight crew's experience with Captain Osbon, they knew or should have known that something was wrong and that Captain Osbon was not fit to fly.

41. Shortly after arriving, Captain Osbon went through the required preflight checklist with First Officer Dowd. Captain Osbon was slow and inefficient in performing the preflight checks, requiring substantial assistance from First Officer Dowd.

42. Captain Osbon's struggle with the preflight checklist was extremely unusual and should have caused JetBlue to inquire concerning his fitness to fly. Captain Osbon's decades of experience rendered the preflight checklist a simple and rote activity.

43. Captain Osbon's fellow crew members, with whom he had repeatedly flown, knew or should have known that Captain Osbon's struggle with the preflight checklist demonstrated he was unable to fly.

44. JetBlue knew, or should have known, from Captain Osbon's tardiness, appearance, and inability to perform simple preflight checks that he was physically and mentally unfit to fly.

45. JetBlue failed to make any effort to ensure that Captain Osbon was fit to fly despite clear evidence and warning signs that he required immediate medical attention.

46. JetBlue nonetheless permitted Captain Osbon to captain Flight 191.

47. During Flight 191, Captain Osbon's actions made it clear he was unable to perform his duties.

48. Airplanes are required to routinely make radio contact with air traffic control.

49. Within 10 minutes of takeoff, Captain Osbon missed two or more required radio check-ins, clearances, and clearance read backs with air traffic control.

50. First Officer Dowd performed these communications after Captain Osbon failed to respond in accordance with Captain Osbon's duties as the Pilot Monitoring (the non-flying pilot).

51. After First Officer Dowd responded to multiple aircraft hails, radio clearances and required clearance read backs, Captain Osbon asked First Officer Dowd, at or before 8 a.m., if he had missed air traffic control calls. First Officer Dowd responded that Captain Osbon had in fact missed multiple air traffic control calls.

52. Captain Osbon reacted with surprise. He did not realize that Flight 191 had received multiple air traffic control calls.

53. At this point, Captain Osbon advised First Officer Dowd that he was clearly unfit to fly, perform his duties as the Pilot Monitoring, and advised First Officer Dowd that he was no longer able to assist with the flight.

54. Captain Osbon relieved himself of command despite the fact he was in the midst of brain seizure and rapidly losing touch with reality.

55. JetBlue knew, or should have known, that Captain Osbon was unfit to fly based upon his actions, inactions, tardiness and appearance.

56. Captain Osbon recognized, even in the midst of a seizure and the associated impairment of his mental faculties, that there was no justification for him to simply ignore two required check-ins with air traffic control. Indeed, Captain Osbon did not even realize the first check-in took place. There is similarly no justification for JetBlue, and its employees, to fail to recognize Captain Osbon's severely impaired condition.

57. After Captain Osbon relieved himself of command, he rapidly began to lose the last limited remaining control over his body and mind.

58. Captain Osbon began to rant and rave about the likelihood of a terrorist attack, various imagined dangers, and the need for Flight 191's crew and passengers to embrace religion.

59. Captain Osbon became increasingly belligerent (although not violent) as his seizure worsened.

60. Nonetheless, JetBlue permitted the flight to continue for approximately 3 additional hours after Captain Osbon advised First Officer Dowd he was unable to perform his duties before finally diverting, and eventually landing, the plane.

61. JetBlue should have immediately diverted the plane and landed after Captain Osbon concluded he was unfit to fly and began to rant and rave *while still in the cockpit*.

62. JetBlue unnecessarily endangered the lives of Captain Osbon, the crew, and the 135 passengers by failing to land the plane.

63. If anything had happened to First Officer Dowd during the flight – a significant possibility since Captain Osbon suffered from his seizure while still within the cockpit – there would not have been anyone remaining to fly the plane. Indeed, even if First Officer Dowd simply suffered an unrelated illness it could have been catastrophic. It is for this very reason commercial flights require two capable pilots.

64. JetBlue's failure is not surprising. As of March 27, 2012, the airline had failed to implement appropriate safety training and procedures to ensure that its crew promptly acted to protect against an unstable crew member. Instead, JetBlue maintained a culture designed to protect the careers of crewmembers that were demonstrably impaired – whether by alcohol, drugs, or other physical or mental instability or illness.

65. As a result of JetBlue's inaction and lax regulations, Captain Osbon was permitted to fly, remain on the plane, and indeed *remain in the cockpit*, while his condition deteriorated.

66. After losing complete control of his faculties, Captain Osbon left the cockpit.

67. Captain Osbon ran down the aisles screaming and ranting concerning imagined terrorism and the need for all on board to embrace religion. During this time, Captain Osbon lost control of his bodily functions.

68. Several of the passengers recorded Captain Osbon's actions and posted them to social media sites.

69. The passengers and crew used force to subdue Captain Osbon causing him to incur physical injuries.

70. When the plane landed, Captain Osbon finally received the medical treatment he needed.

71. Captain Osbon was subsequently charged with federal crimes including interfering with a flight crew, punishable by up to 20 years imprisonment.

72. The United States District Court for the Northern District of Texas determined that Captain Osbon was not responsible for his actions during Flight 191. He was therefore released from custody, and the charges against him dismissed, subject to certain monitoring conditions, which remain in place.

73. During the criminal inquiry into Captain Osbon's conduct, he surrendered his pilot's medical certificate at the request of the federal government, including the Federal Aviation Administration (the "FAA").

74. Without a valid pilot's medical certificate, Captain Osbon cannot pilot a commercial plane.

75. If Captain Osbon had not surrendered his medical certificate, the FAA informed him it intended to begin regulatory proceedings to revoke his pilot's license.

76. JetBlue's: (a) failure to establish appropriate safety protocols designed to ensure its crewmembers are fit to fly; (b) failure to ensure that Captain Osbon was fit to fly on March 27, 2012; (c) failure to replace Captain Osbon prior to Flight 191's departure from the gate and ensuing takeoff after he proved unfit to fly; and (d) failure to land Flight 191 promptly after Captain Osbon proved a danger to himself and others, caused Captain Osbon significant harm. This harm includes national public embarrassment through both extensive traditional media coverage and social media postings, Captain Osbon's arrest, and the destruction of Captain Osbon's career and future employment prospects.

77. If JetBlue simply replaced Captain Osbon prior to his flight, he would have privately received the medical treatment he needed without national public embarrassment, revocation of his medical certificate, criminal charges, and the destruction of his career and all future employment prospects.

78. Captain Osbon's brain damage and associated seizures were not diagnosed until several months after his arrest. During this period, while Captain Osbon was still in the custody of the federal government, he suffered a second seizure.

79. After Captain Osbon was diagnosed with brain damage and seizures in connection therewith, he was prescribed medication for his condition.

80. Captain Osbon has not suffered any seizures while taking his prescribed medication.

81. Captain Osbon diligently takes his prescribed medication in accordance with his doctor's instructions.

82. Captain Osbon was advised by his doctors that he will not suffer another seizure as long as he continues to take his medication.

83. Captain Osbon's doctors have not placed any restrictions upon his activities based upon his condition.

84. Captain Osbon is presently permitted to drive and retains a driver's license.

85. As long as Captain Osbon takes his medication, he is fully capable of all activities without posing any harm to himself or others, including while flying a plane.

86. To this day, a simple internet search for Captain Osbon's name yields a legion of news articles, pictures and videos discussing in detail the unfortunate events of March 27, 2012 (that JetBlue failed to prevent), the subsequent trial, and the litany of passenger lawsuits against JetBlue and Captain Osbon.

87. For the five years prior to Captain Osbon's medical leave, he earned average annual compensation worth approximately $303,300 plus annual profit sharing benefits equal to a minimum of 5% of Captain Osbon's annual income, disability, medical and life insurance benefits, 401k contribution matching, and flight benefits—specifically, Captain Osbon and his immediate family could fly for free on JetBlue flights and at steep discounts on certain other airlines' flights.

## FIRST CAUSE OF ACTION

(Breach of Contract)

88. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

89. The express and implied terms of Captain Osbon's employment by JetBlue, associated oral and written agreements with JetBlue, and FAA regulations, nclude the requirement that JetBlue will create and implement appropriate safety regulations and protocols to ensure that Captain Osbon, and his fellow flight crewmembers, are fit to fly prior to flying.

90. Prior to March 27, 2012, JetBlue failed to implement appropriate procedures and safety regulations for the monitoring and replacement of unfit pilots or other flight crewmembers.

91. On March 27, 2012, JetBlue failed to apply those procedures and regulations it did implement to prevent Captain Osbon, who was not fit to fly, from piloting Flight 191.

92. JetBlue's failure to implement and apply appropriate procedures and regulations to prevent Captain Osbon from flying on March 27, 2012, and to timely ground the plane after Captain Osbon removed himself from command, caused Captain Osbon to incur substantial harm. This harm includes, but is not limited to: (a) physical injury including significant bruising across his wrist, arms, neck and head; (b) a delay in the treatment of Captain Osbon's brain seizures; (c) imperiling Captain Osbon's life as well as the lives of the other crewmembers and passengers; (d) the destruction of Captain Osbon's career and reputation; (g) national public embarrassment; (h) forcing Captain

Osbon to defend criminal charges; and (i) forcing Captain Osbon to surrender his pilot's medical certificate.

93.   Captain Osbon seeks damages for the foregoing conduct equal to lost wages from March 27, 2012 through his expected retirement at age 65 in an amount not less than $4,852,800 ($303,300 x 16 years) plus appropriate increases for promotions and raises and 9% interest from the date of breach in addition to annual profit sharing benefits equal to a minimum of 5% of Captain Osbon's annual income, disability, medical and life insurance benefits, 401k contribution matching, and flight benefits (Captain Osbon and his immediate family could fly for free on JetBlue flights and at steep discounts on certain other airlines' flights during his employment and would have been permitted to following his retirement).

94.   Captain Osbon further seeks $2,426,400 for the permanent damage to his reputation, and $4,852,800 for punitive damages.

95.   Captain Osbon further seeks $100,000 for physical injury damages and $2,426,400 for emotional distress damages.

## SECOND CAUSE OF ACTION

(Negligence)

96.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

97.   JetBlue had a duty to Captain Osbon to ensure that each of the members of its flight crew were fit to fly.

98.   JetBlue's failure to ensure that Captain Osbon was fit for flight dut, caused Captain Osbon to incur substantial harm. This harm includes, but is not limited to: (a)

physical injury including significant bruising across his wrist, arms, neck and head; (b) a delay in the treatment of Captain Osbon's brain seizures; (c) imperiling Captain Osbon's life as well as the lives of the other crewmembers and passengers; (d) the destruction of Captain Osbon's career and reputation; (g) national public embarrassment; (h) forcing Captain Osbon to defend criminal charges; and (i) forcing Captain Osbon to surrender his pilot's medical certificate.

99. Captain Osbon seeks damages for the foregoing conduct equal to lost wages from March 27, 2012 through his expected retirement at age 65 in an amount not less than $4,852,800 ($303,300 x 16 years) plus appropriate increases for promotions and raises and 9% interest from the date of breach in addition to annual profit sharing benefits equal to a minimum of 5% of Captain Osbon's annual income, disability, medical and life insurance benefits, 401k contribution matching, and flight benefits (Captain Osbon and his immediate family could fly for free on JetBlue flights and at steep discounts on certain other airlines' flights during his employment and would have been permitted to following his retirement).

100. Captain Osbon further seeks $2,426,400 for the permanent damage to his reputation, and $4,852,800 for punitive damages.

101. Captain Osbon further seeks $100,000 for physical injury damages and $2,426,400 for emotional distress damages.

### THIRD CAUSE OF ACTION

(Negligence)

102. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if separately set forth herein.

103. JetBlue had a duty to Captain Osbon to ensure he had access to medical attention if a medical emergency arose. This was particularly true in a circumstance, such as arose during Flight 191, wherein Captain Osbon was unable to care for himself.

104. JetBlue's failure to timely land Flight 191 after Captain Osbon notified First Officer Dowd of his impairment and relieved himself of his responsibilities: caused Captain Osbon to incur physical injury including significant bruising across his wrist, arms, neck and head; caused a delay in the treatment of Captain Osbon's brain seizures; imperiled Captain Osbon's life as well as the lives of the other crewmembers and passengers; destroyed Captain Osbon's career and reputation; caused Captain Osbon national public embarrassment; forced Captain Osbon to defend criminal charges and to surrender his pilot's medical certificate.

105. Captain Osbon seeks damages for the foregoing conduct equal to lost wages from March 27, 2012 through his expected retirement at age 65 in an amount not less than $4,852,800 ($303,300 x 16 years) plus appropriate increases for promotions and raises and 9% interest from the date of breach in addition to annual profit sharing benefits equal to a minimum of 5% of Captain Osbon's annual income, disability, medical and life insurance benefits, 401k contribution matching, and flight benefits (Captain Osbon and his immediate family could fly for free on JetBlue flights and at steep discounts on certain other airlines' flights).

106. Captain Osbon further seeks $2,426,400 for the permanent damage to his reputation, and $4,852,800 for punitive damages.

107. Captain Osbon further seeks $100,000 for physical injury damages and $2,426,400 for emotional distress damages.

WHEREFORE, Plaintiff demands a trial by jury and judgment upon each of his claims against Defendant as follows:

A. compensatory damages, including, but not limited to, back pay, front pay, in an amount to be determined at trial but in any event not less than $4,852,800;

B. severance in an amount to be determined to trial, but in any event not less than $250,000;

C. $2,426,400 for permanent damage to Captain Osbon's reputation;

D. $4,852,800 for punitive damages;

E. $2,426,400 for emotional distress damages;

F. $100,000 for physical injuries;

G. 9% prejudgment and post-judgment interest; and

H. all such other and further relief as this Court deems just and proper.

Dated: New York, New York
       March 27, 2015

LIDDLE & ROBINSON, L.L.P.

By: *[signature]*

Jeffrey L. Liddle, Esq.
Matthew J. McDonald, Esq.
800 Third Avenue
New York, New York 10022
Tel: (212) 687-8500
Fax: (212) 687-1505

*Attorneys for Plaintiff*